In the

# United States Court of Appeals
## For the Seventh Circuit

No. 04-1405

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

VINCENT TODD,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 03 CR 96—**Ronald A. Guzman**, *Judge.*

ARGUED NOVEMBER 8, 2004—DECIDED SEPTEMBER 7, 2005

Before BAUER, EASTERBROOK, and KANNE, *Circuit Judges.*

BAUER, *Circuit Judge.*   A jury convicted defendant-appellant Vincent Todd of attempting to board an airplane with a stun gun in violation of 49 U.S.C. § 46505. He appeals, arguing that his conviction should be vacated because he did not knowingly and voluntarily waive his right to counsel and the prosecution failed to timely produce evidence that was favorable to his defense. We affirm.

## I. Background

On January 27, 2003, Todd was preparing to fly from

Chicago's Midway International Airport to Los Angeles to answer criminal charges in a gun possession case stemming from a prior arrest. An x-ray machine operator at a Midway Airport security checkpoint noticed on his screen that Todd's carry-on bag contained an opaque box. Todd agreed to step out of line and to submit to a search of his bag. A security employee opened Todd's bag and found a box sandwiched between a bottle a mouthwash and a can of deodorant which contained a fully activated, 300,000-volt Z-Force stun gun. Todd was arrested. He waived his *Miranda* rights and explained to Special Agent Robert Amann that he had purchased the stun gun for protection and that he believed that people—particularly law enforcement officers—were following him. He also described the stun gun's location in his bag and recalled that he had used the deodorant the night before and the mouthwash earlier that morning.

On January 28, 2003, Todd made his initial appearance before Magistrate Judge Martin C. Ashman. Judge Ashman advised Todd of his right to counsel and had the prosecutor state the charge against Todd and its maximum penalty. Todd acknowledged that he understood. The magistrate judge then appointed Mary Judge of the Public Defender Program to represent Todd. Two days later, Judge Ashman granted Todd's request for pretrial release but ordered that he be confined to his father's home and submit to electronic monitoring.

On February 19, 2003, Todd made his first appearance before District Judge Ronald A. Guzman. The government sought to revoke Todd's release because he had tampered with his electronic monitoring bracelet. The government also asked the court to order a psychiatric evaluation to determine whether Todd posed a safety risk. In support of its request, the government noted that Todd showed signs of paranoia; in addition to believing that government agents were following him, he was convinced that his present case

was part of a larger conspiracy against him. Defense attorney Judge acknowledged Todd's paranoia but assured the court that Todd understood the seriousness of his offense. She also stated that Todd would refuse to participate in a court-ordered psychiatric evaluation but would agree to undergo an evaluation arranged by the Public Defender Program. The government accepted her offer, and the court revoked Todd's release pending the results of the evaluation.

On February 26, 2003, Todd was evaluated by Michael L. Fields, Ph.D., of Human Resources Associates in Chicago. Fields summarized his conclusions in a report, which stated that Todd understood that bringing a stun gun on an airplane was illegal and did not appear remorseful about having done so. The report also indicated that Todd was "intensely paranoid" and suffered from "what appeared to be a probable delusional process." R. at 52. Fields further noted that Todd's test results revealed "significant psychopathology." *Id.*

Todd did not agree with the psychologist's assessment and refused to disclose the results of the evaluation to the district court or the government. This decision put him at odds with defense counsel Judge, and Todd filed a motion to have her dismissed. On April 1, 2003, the court granted Todd's motion and appointed a second attorney, Gene Steingold, to take Judge's place. Steingold represented Todd for three months. During that time, Todd grew increasingly suspicious of Steingold's motives. Steingold, in turn, complained that Todd's distrust in him and the court made working with Todd impossible. Nevertheless, Steingold assured the court that Todd was competent and understood the seriousness of the proceedings. The court tried to allay Todd's concerns and discourage him from seeking Steingold's dismissal, but was unsuccessful. On July 10, the court issued Todd an ultimatum: He could continue with Steingold or he could proceed without counsel, but the court

would not appoint a third attorney. Todd chose to proceed *pro se*, and the court appointed Steingold standby counsel.

Todd proceeded without counsel for three weeks until the next hearing. On August 4, 2003, the district court reconsidered its decision and offered to appoint a third attorney. Todd accepted, and the court appointed Gerald Collins to represent him. Unfortunately, Todd grew suspicious of Collins' motives, too. When the court inquired into the problem, Collins explained that Todd's psychiatric evaluation indicated that he suffered from extreme paranoia. Yet, Collins added, Todd understood the charge pending against him. On September 2, Collins submitted to the court under seal a copy of Todd's psychiatric evaluation. This confirmed Todd's suspicions about Collins, and Todd moved to have Collins dismissed. On September 4, the court granted Todd's motion and appointed Collins as standby counsel.

At Todd's final pretrial hearing on October 2, 2003, the district court thoroughly admonished Todd of the disadvantages of proceeding *pro se*. Undeterred, Todd went to trial on October 8 with the aid of standby counsel. On October 10, Todd was convicted by a jury and sentenced to one year in prison and three years' supervised release. Todd asked the court to vacate his conviction, claiming, among other things, that the government had failed to timely produce copies of papers favorable to his defense. The court denied his motion for a new trial. Todd timely appealed to this court.

## II.  Discussion

Todd raises two issues on appeal. First, he argues that he did not knowingly and intentionally waive his right to counsel. Second, he contends that the government failed to timely produce medical documents that he had in his possession when arrested, and that the district court's finding to the contrary and subsequent denial of his motion for a new trial was in error. We review both issues for abuse of discretion.[1] *United States v. Avery*, 208 F.3d 597, 601 (7th Cir. 2000); *United States v. Asher*, 178 F.3d 486, 496 (7th Cir. 1999).

## A.  Waiver of Counsel

Todd argues that he did not knowingly and intelligently waive his right to counsel because the district court failed to warn him of the risks of proceeding *pro se* and failed to ensure that he understood those risks. He contends that this violated his Sixth Amendment rights and that we should vacate his conviction.

The Sixth Amendment guarantees the right to counsel not just at trial, but during all "critical stages of the prosecution." *United States v. Lane*, 804 F.2d 79, 81 (7th Cir. 1986)

---

[1]  Both parties cite *United States v. Hoskins*, 243 F.3d 407, 410 (7th Cir. 2001), for the proposition that the standard of review for Todd's waiver claim is *de novo*. We believe the proper standard of review is for abuse of discretion. *United States v. Avery*, 208 F.3d 597, 601 (7th Cir. 2000); *see also Faretta v. California*, 422 U.S. 806, 812 n. 7 (1974) (noting that the state court of appeals reviewed whether waiver was knowing and intelligent for abuse of discretion); *United States v. Berkowitz*, 927 F.2d 1376, 1383 (7th Cir. 1991) (recognizing that trial judge is in best position to assess whether defendant's waiver was knowing). However, we would have reached the same result in this case had we reviewed the district court's decision *de novo*.

(quoting *United States v. Wade*, 388 U.S. 218, 237 (1967)). "A critical stage is one where potential substantial prejudice to defendant's rights inheres in the . . . confrontation [of the accused by the prosecution] and where counsel's abilities can help avoid that prejudice." *United States v. O'Leary*, 856 F.2d 1011, 1014 (7th Cir. 1988) (citing *Coleman v. Alabama*, 399 U.S. 1, 9 (1970)). It is settled that the indictment and the arraignment are always starting points in the prosecution. *Lane*, 804 F.2d at 82. In fact, the Supreme Court has recognized that the period from arraignment to trial is "perhaps the most critical period of the proceedings." *Wade*, 388 U.S. at 225 (quoting *Powell v. Alabama*, 287 U.S. 45, 57 (1932)). Since Todd was arraigned on February 19, 2003, his Sixth Amendment right to counsel had attached well before July 10, which was the first time that he elected to proceed without an attorney.

A criminal defendant is entitled to waive his right to counsel and to conduct his own defense when he knowingly and intentionally elects to do so. *Faretta v. California*, 422 U.S. 806, 835 (1975). To determine whether a defendant's decision to proceed *pro se* was knowing and informed, we consider four factors: (1) whether and to what extent the district court conducted a formal hearing into the defendant's decision to represent himself; (2) other evidence in the record that establishes whether the defendant understood the dangers and disadvantages of self-representation; (3) the background and experience of the defendant; and (4) the context of the defendant's decision to waive his right to counsel. *Avery*, 208 F.3d at 601. The most reliable way for a district court to ensure that the defendant has been adequately warned of the dangers and disadvantages of self-representation is to conduct a formal inquiry. *United States v. Maya-Gomez*, 860 F.2d 706, 733 (7th Cir. 1988). However, failure to conduct a full inquiry is not necessarily fatal. "[T]he ultimate question is not what was said or not said to the defendant but rather whether he in fact made a

knowing and informed waiver of counsel." *Id.* at 733.

The first factor that we consider is whether the district court made a formal inquiry into Todd's decision to proceed *pro se.* District judges are not expected to give "a hypothetical lecture on criminal law." *Moya-Gomez*, 860 F.2d at 732. However, the court should explore whether the defendant realizes the difficulties he will encounter in acting as his own attorney and advise the defendant that proceeding *pro se* is unwise. *Id.* It is not enough for the court merely to confirm that it is the defendant's wish to represent himself; rather, the court must impress upon the defendant the disadvantages of self-representation. *Id.* at 734.

Todd first elected to proceed without counsel on July 10, 2003, and did so again on September 4. Both times the district court limited its inquiry to whether Todd understood that the court would appoint no further attorneys. These inquiries were inadequate because the court failed to probe whether Todd recognized the disadvantages of proceeding *pro se. Moya-Gomez*, 860 F.2d at 734. When the issue of representation reemerged on October 2, several days before trial, the court thoroughly admonished Todd of the dangers of proceeding without counsel.[2] Pretrial Tr. 10.02.03 at 22-25. Yet, the adequacy of the October 2 warning did not compensate for the court's failure to properly warn Todd before allowing him to proceed *pro se* for two, brief periods—from July 10 through August 4 and from September 4 through October 2—prior to trial. This

---

[2] Todd argues that the court's October 2 warning was *pro forma* and also encouraged him to proceed *pro se.* Since this factor weighs in Todd's favor, we choose not to address his claims. We will say, however, that the court's lengthy warning was neither inadequate nor improperly suggestive. What is more, the court previously warned Todd against proceeding without counsel. Pretrial Tr. 6.20.03 at 6-7.

weighs against finding that Todd's waivers of his right to counsel during critical pretrial proceedings were knowing and intelligent. *United States v. Bell*, 901 F.2d 574, 578 (7th Cir. 1990).

The second factor that we consider is whether there is other evidence that Todd understood the dangers and disadvantages of self-representation. We believe there is. Some of this evidence came directly from statements that Todd made. At his initial court appearance, Todd acknowledged that he understood the charge against him and the penalties it carried. Pretrial Tr. 1.28.03 at 4. Todd identifies occasions when he told the court that he did not understand the charge or when he underestimated the potential penalties, but those comments were contradicted by later statements. For example, on July 30, 2003, Todd confirmed that he had in fact received the "accurate charges, which meant the indictment and everything that went with it." Pretrial Tr. 7.30.03 at 4. Further, Todd demonstrated his understanding of the charge during his opening remarks by declaring himself "not guilty of knowing that the stun gun was in his bag while trying to board an aircraft." Trial Tr. at 17. The record reveals that the inconsistencies Todd highlights were more likely caused by his obstreperousness than any mental incapacity. In addition, when Todd first elected to proceed *pro se*, he acknowledged that his lack of skills would place him at a disadvantage: "[Steingold is] not representing me. I'd rather lose it myself." Pretrial Tr. 7.10.03 at 5. This was another indication that Todd realized he was taking a risk by representing himself. *Bell*, 901 F.2d at 578.

Furthermore, Judge Guzman and Todd's three attorneys all believed that Todd recognized that the proceedings were serious. Defense attorney Judge told the court that although Todd "has some mental health paranoid kind of issues," he is capable of understanding "the seriousness of the offense, he understands the consequences of his

behavior . . . ." Pretrial Tr. 2.19.03 at 10. Defense attorney Steingold stated that "while my client has mental problems, I think he understands the proceedings, and . . . I believe he's competent to stand trial, and I believe he was fit or sane at the time this happened." Pretrial Tr. 6.20.03 at 11-12. Similarly, defense attorney Collins acknowledged that although Todd's psychiatric evaluation indicated that Todd suffered from extreme paranoia, "based on my conversations with him, he certainly has an understanding of the charges and he's able to cooperate with me." Pretrial Tr. 8.18.03 at 9. In addition, Judge Guzman was impressed by Todd's understanding of how the events of September 11, 2001, made the charge against him more serious than it otherwise might have been. Pretrial Tr. 6.20.03 at 14.

Todd claims that, regardless of what his attorneys and the judge believed, the district court erred by not considering the results of his psychiatric evaluation. This argument is puzzling because it signifies a 180-degree turn from the position Todd staunchly held throughout the pretrial and trial proceedings. The court inquired about the evaluation at least six times prior to trial. Todd adamantly refused to disclose the results of his evaluation because he believed that its conclusions were wrong and would compromise his defense. Pretrial Tr. 9.4.03 at 12. In fact, Todd prohibited his attorneys from even mentioning the evaluation. The only reason why the psychiatric evaluation appears in the record is because defense attorney Collins submitted a copy to the court, an action that Todd viewed as evidence of betrayal. The court should not be held to blame for Todd's intransigence.

Moreover, though the results of Todd's psychiatric evaluation are disquieting, they do not demonstrate that his waivers were not knowing or voluntary. The psychologist who authored the report stated that Todd "knew it was illegal, or at least inappropriate to have a weapon with him

going on to a plane, and he did appear to be somewhat dismayed that he made such a foolish error." R. at 52. The psychologist was also understandably alarmed about Todd's extreme paranoia. Judge Guzman and Todd's attorneys were concerned, too, but they reached the unanimous conclusion that Todd was capable of understanding the seriousness of the proceedings. *See United States v. Hill*, 252 F.3d 919, 925 (7th Cir. 2001) (observing that any person competent to stand trial is able to waive counsel). We find that their observations carry more weight than those of the psychologist, who formed his conclusions after observing Todd for only a day. Todd argues that his evaluation should nonetheless have prompted the court to engage in the type of reality testing that we advocated in *United States v. Sandles*, 23 F.3d 1121, 1127 (7th Cir. 1994). We disagree. In *Sandles*, the defendant had declared he would present an insanity defense at trial; Todd, by contrast, maintained throughout the proceedings that he was competent, and his attorneys and the judge ultimately agreed. This weighs heavily in favor of finding that Todd's waiver was knowing and intelligent.

The third factor that we consider is Todd's background and experience. "In this context, background and experience includes educational achievements, prior experience with the legal system (including prior *pro se* representation), and performance at trial in the case at bar." *Sandles*, 23 F.3d at 1128-29 (internal quotes omitted). The district court did not inquire into Todd's background, but that error was not fatal. *Moya-Gomez*, 860 F.2d at 736. Although the record shows that Todd has only a tenth-grade education, he demonstrated at trial that he could represent himself. For example, Todd made motions, offered evidence that was admitted, conducted cross-examinations, and tried to impeach a witness. The record also indicates that Todd had substantial experience with the judicial system; he had been arrested over a dozen times, with two prior convictions (one

for contempt of court and one for assault and battery), and—significantly—had at least one prior weapons charge. Despite the lack of evidence that Todd represented himself at those proceedings, we have held that a defendant's prior experience with the judicial system tends to show that he understood that the charge against him was serious and that he was accepting a risk by representing himself. *United States v. Egwaoje*, 335 F.3d 579, 585-86 (7th Cir. 2003). Therefore, this factor weighs in favor of finding a valid waiver, as well.

The fourth factor that we consider is the context of Todd's decision to proceed *pro se*. We have held that a defendant who waives his right to counsel for strategic reasons tends to do so knowingly. *See Bell*, 901 F.2d at 579 (finding that a defendant's tactical decision to proceed *pro se* as a result of his attorney's unwillingness to present an alibi defense supports the finding of a knowing waiver). Todd chose to represent himself because he believed that his court-appointed attorneys would employ a weak and ineffective defense. He baldly stated that he did not trust court-appointed attorneys: "I don't want a court-appointed attorney. I do not trust the courts." Pretrial Tr. 10.2.03 at 25. In addition, we have found that although standby counsel is no substitute for actual counsel, a defendant's use of standby counsel shows an appreciation for the difficulties of self-representation. *Sandles*, 23 F.3d at 1128. Todd deferred several times at trial to his standby counsel on matters pertaining to objections and jury instructions. Thus, this factor also weighs in favor of finding a valid waiver.

Although the district court should have conducted a formal inquiry into Todd's understanding of the risks of proceeding without counsel when he first waived his right to an attorney, the error was not fatal because the remaining factors weigh in favor of finding a knowing and intelligent waiver. *Bell*, 901 F.2d at 579; *Moya-Gomez*, 860 F.2d

at 738-39. Therefore, we agree with the court that Todd understood the risks of proceeding *pro se* and nonetheless knowingly and intelligently waived his right to counsel.

## B. The *Brady* Claim

Todd also contends that his conviction should be vacated because the government did not timely produce records favorable to his defense. On October 2, 2003, the district court ordered the government to produce documents that were taken from Todd upon his arrest. These materials included a report by the Department of Veterans Affairs that showed Todd suffered from memory loss as a result of a head injury sustained while serving in the United States Army. In its order denying Todd's motion for a new trial, the court found that the government had hand-delivered copies of the requested materials to Todd's attention at the Metropolitan Correction Center and to standby defense attorney Collins on August 6, two days before the start of trial. *United States v. Todd*, No. 03 CR 96, 2003 WL 22802375, at *1 (N.D.Ill. Nov. 25, 2003). The court also found that on the morning of August 8, the first day of trial, Collins set copies of the report on his table, which made them readily available to Todd. *Id.* Todd maintains that he did not receive the materials until the evening of August 10, by which time the case had been submitted to the jury. He contends that even if he had access to the documents on August 6, we should still consider them suppressed because the government did not provide Todd with sufficient time to incorporate the materials in his defense.

*Brady v. Maryland*, 373 U.S. 83 (1963), prohibits government prosecutors from withholding evidence that is favorable to the defense. *Id.* at 87. The suppression of such evidence deprives the defendant of a fair trial and thus violates due process. *Id.* To prevail on a *Brady* claim, a defendant must establish that: (1) the government sup-

pressed the evidence; (2) the suppressed evidence was favorable to the defendant; and (3) the suppressed evidence was material to an issue at trial. *United States v. O'Hare*, 301 F.3d 563, 569 (7th Cir. 2002). Evidence is suppressed for *Brady* purposes when (1) the prosecution failed to disclose the evidence in time for the defendant to make use of it, and (2) the evidence was not otherwise available to the defendant through the exercise of reasonable diligence. *Id.* (citing *Boss v. Pierce*, 263 F.3d 734, 740 (7th Cir. 2001)).

The district court's decision that the government did not suppress Todd's reports was not an abuse of discretion. Because Todd was intimately familiar with the information contained in the documents in question, he should have been able to utilize that information in his defense when the documents were delivered two days before trial. Even if we assume that Todd did not have access to the documents until the morning of trial, he still could have quickly incorporated them into his defense because he was familiar with the material. Had Todd needed the information sooner, he could have subpoenaed the Department of Veterans Affairs, which he had done previously to obtain other materials. Pretrial Tr. 6.5.03 at 2. Moreover, the fact that Todd gave no indication at trial that he had not received the materials was yet another indication that they were not suppressed for *Brady* purposes. R. at 86.

More importantly, Todd has not demonstrated that the reports were material. Evidence is material for *Brady* purposes "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Kyles v. Whitley*, 514 U.S. 419, 433-34 (1995). Todd maintains that this evidence was material because it would have shown that he did not knowingly attempt to bring a stun gun though airport security, but rather forgot that it was in his carry-on bag. We disagree that the reports would have made a significant difference. Todd told the jury about his disability in both his

opening statement and closing remarks. Trial Tr. at 16-17, 239. Apart from those comments, he chose not to testify or present evidence on the issue. Thus, our confidence in the outcome of Todd's trial is not shaken by the documents' exclusion.

### III.  Conclusion

For the foregoing reasons, we AFFIRM Todd's conviction and the district court's denial of his motion for a new trial.

A true Copy:

      Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*

USCA-02-C-0072—9-7-05